**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | |
|---|---|
| **OLIVIA PONDER-WALLACE**, | |
| Plaintiff, | |
| v. | Civil Action No. 7:16-CV-174 (HL) |
| **SANDERSON FARMS, INC.**, | |
| Defendant. | |

**ORDER**

Plaintiff Olivia Ponder-Wallace, a former employee of Defendant Sanderson Farms, Inc., filed this lawsuit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), alleging that Defendant discriminated against her as to her pay and discipline based on her race. Plaintiff further claims that Defendant subjected her to a hostile work environment based on her religion in violation of Title VII.[1] Now before the Court is Defendant's Motion for Summary Judgment. (Doc. 38). After reviewing the pleadings, briefs, depositions, and other evidentiary materials presented, and with the benefit of oral argument, the Court concludes that there is no genuine dispute of the material facts and finds that Defendant is entitled to judgment as a matter of law.

---

[1] Plaintiff previously claimed that Defendant discriminated against her on the basis of her age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. Citing to Gross v. FBL Fin. Servs., 557 U.S. 167 (2009), Plaintiff withdrew her age discrimination claim at the hearing held on July 11, 2018.

## I.    MOTION TO STRIKE

As a part of her response to Defendant's Motion for Summary Judgment, Plaintiff attached the affidavits of three individuals: Shanice Roseborough (Doc. 42-4); Ronald Alford (Doc. 42-5); and Greg Ward (Doc. 42-6). Defendant objects to the admissibility of the proffered affidavits and moves the Court to strike them from the record. (Doc. 48). For the following reasons, the Court **GRANTS** Defendant's motion.

At the hearing held on this matter, Plaintiff conceded that the affidavit of Greg Ward does not comply with the disclosure requirements of Federal Rule of Civil Procedure 26(a) and (e) because Plaintiff never identified Ward as a potential witness during discovery. When a "party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(c)(1). Because Plaintiff did not previously disclose Greg Ward as a potential witness, and because Plaintiff has not offered any justification for the omission, the affidavit of Greg Ward is properly stricken from the record. Ward's affidavit is otherwise properly stricken because it is apparent that he was last employed by Defendant in 2010, three years prior to Plaintiff's employment. He, therefore, has no personal knowledge of the circumstances preceding Plaintiff's termination, and his affidavit is consequently irrelevant. See Fed.R.Civ.P. 56(c)(4) ("An affidavit or

declaration used to support or oppose a motion must be made on personal knowledge . . . and show that the affiant or declarant is competent to testify on the matters stated.").

Defendant moves the Court to strike the affidavits of Shanice Roseborough and Ronald Alford because the documents were not properly notarized and do not satisfy the requirements for unsworn declarations set forth at 28 U.S.C. § 1746. Under Georgia law, "[a] notary shall be disqualified from performing a notarial act in the following situations which impugn and compromise the notary's impartiality: . . . [w]hen the notary is a party to the document or transaction for which the notarial act is required." O.C.G.A. § 45-17-8(c)(2). Here, Plaintiff impermissibly served as the notary for the two affidavits in question. Because Georgia law does not permit her to perform that function, the affidavits are effectively unsworn declarations. While unsworn declarations may be given the same force and effect as an affidavit, the declaration must be signed, dated, and include language in substantially the following form: "I declare (or certify, verify, state) under penalty of perjury . . . that the foregoing is true and correct." 28 U.S.C. § 1746(2). The affidavits submitted by Plaintiff do not meet these qualifications and, accordingly, will not be taken into consideration in evaluating the pending motion for summary judgment.

Following the hearing, Plaintiff filed amended versions of the Roseborough and Alford affidavits containing the notary seal of a disinterested notary. (Doc.

50). The local rules of this Court provide that "[b]riefing of any motion or issue concludes when the movant files a reply brief." M.D.Ga. L.R. 7.3.1(A). Any party desiring to be heard further on an issue must obtain permission from the Court before filing additional documents. M.D.Ga. L.R. 7.3.1(C). Even though the amended affidavits technically are not briefs, the Court is of the opinion that they fall squarely within the Local Rule. Plaintiff did not properly request permission to file the amended documents and, subsequently, they shall be stricken from the record. The Court further notes the untimeliness of Plaintiff's attempt to correct the error. Defendant filed its motion to strike on May 10, 2018, alerting Plaintiff to the notarization issue. Plaintiff failed to file any sort of response to Defendant's motion. When questioned at the July 11, 2018 hearing about why Plaintiff had not simply responded to the motion and refiled the affidavits, Plaintiff offered no explanation. The Court is not now inclined to permit the supplementation.

## II. MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes

demonstrate the absence of a genuine issue of material fact.'" <u>Hickson Corp. v.</u> <u>N. Crossarm Co.</u>, 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting <u>Celotex Corp. v.</u> <u>Catrett</u>, 477 U.S. 317, 323 (1986) (internal quotations omitted)). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986). A fact is material if it is relevant or necessary to the outcome of the case. <u>Id.</u> at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. <u>Id.</u> An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Id.</u> at 249–50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. <u>Patton v. Trial Guar. Ins. Corp.</u>, 277 F.3d 1294, 1296 (11th Cir. 2002). To assist the Court in reviewing the pertinent evidence, Local Rule 56 requires the moving party to submit a statement of material, undisputed facts supported by specific citations to the record. M.D.Ga. L.R. 56. The local rule provides that the responding party then file the following:

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine dispute to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the movant's statement which are not specifically controverted by

specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate.

Id. "The rule is designed to help the court identify and organize the issues in the case." Mann v. Taser Intern., Inc., 588 F.3d 1291, 1303 (11th Cir. 2009) (holding that where a plaintiff's failure to comply with Local Rule 56 is more than a mere technicality the court may properly deem the defendant's statement of material facts admitted) (citing Reese v. Herbert, 527 F.3d 1253, 1268 (11th Cir. 2008)).

Plaintiff failed to comply with these requirements. Even though Plaintiff responded to each of Defendant's enumerated statements of fact, Plaintiff neglected to support any dispute with Defendant's version of the facts with a single citation to the record, instead providing conclusory remarks and blanket denials. Defendant's Statement of Undisputed Material Facts (Doc. 38-4) is accordingly deemed admitted in its entirety.

Plaintiff's statement of additional facts is similarly deficient. (Doc. 42-1, p. 16-18). In her supplemental statement of disputed material facts, Plaintiff cites only two times to an evidentiary source: the deposition of Keisly Exum. She provides one citation to Defendant's Memorandum of Law in Support of Summary Judgment and otherwise cites exclusively to her Amended Complaint, neither of which constitute evidence sufficient to withstand a properly supported motion for summary judgment. See Fed.R.Civ.P. 56(c)(1)(A); Celotex, 477 U.S. at 324.

As the Eleventh Circuit explained in <u>Mann</u>, where the non-moving party fails to comply with Local Rule 56, which is the mechanism by which she can establish a genuine issue of material fact, "the court has before it the functional analog of an unopposed motion for summary judgment." <u>Id.</u> (quotation marks and citation omitted). However, even in an unopposed motion, the moving party bears the burden of identifying "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that establish the absence of a genuine issue of material fact. <u>Celotex</u>, 477 U.S. at 323. "That is, the movant is not absolve[d] . . . of the burden of showing that it is entitled to judgment as a matter of law." <u>Reese</u>, 527 F.3d at 1268; <u>see also</u> <u>United States v. Delbridge</u>, 2008 WL 1869867, at *3 (M.D. Ga. Feb. 22, 2008) ("a district court cannot grant a motion for summary judgment based on default or as a sanction for failure to properly respond") (citing <u>Trustees of Central Pension Fund of Int'l Union of Operating Eng'rs and Participating Emp'rs v. Wolf Crane Serv., Inc.</u>, 374 F.3d 1035, 1039 (11th Cir. 2004). Therefore, even after deeming the movant's statement of material facts to be admitted, the district court still must review the movant's citations to the record to ensure that there is no genuine issue of material fact. <u>Reese</u>, 527 F.3d at 1269 (quoting <u>United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida</u>, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004)).

## B.    Factual Background

### 1.    Hiring of Plaintiff

Defendant Sanderson Farms, Inc. ("Sanderson Farms") hired Plaintiff Olivia Ponder-Wallace ("Wallace"), a black woman, as a second shift personnel supervisor in the Human Resources ("HR") department in April 2013. (Doc. 31-1, p. 40; Doc. 42-2, p. 10). Prior to her employment with Sanderson Farms, Wallace earned her degree in Business Management with a concentration in Human Resources from Albany State. (Doc. 38-1, p. 18). She was working on her Master's Degree in Public Administration with a double concentration in Human Resources and Health Care Management when she started the job with Sanderson Farms. (Id. at p. 33).[2] Even though Wallace had a formal degree in a Human Resources field and was in the process of earning an advanced degree in the subject matter, she had never formally held an HR position similar to the one at Sanderson Farms, nor had she ever worked in a processing plant. (Id. at p. 41, 147).

The HR department at Sanderson Farms is comprised of a number of positions: receptionist, processing secretary, employee records clerk, three

---

[2] Plaintiff completed her Master's Degree at Albany State in 2014. (Doc. 38-1, p. 33). Sanderson Farms provided her with tuition reimbursement for her coursework. (Id. at p. 75-76). She began working toward her Doctorate in Organizational Leadership through Grand Canyon University in 2015. (Id. p. 34). She applied for tuition reimbursement for that program as well, but while her request was approved at the local level, Sanderson Farms terminated her before final approval by the executive committee. (Id. at p. 83-84).

nurses, and three personnel supervisors. (Doc. 42-2, p. 16-17). These individuals are overseen by the Field Employee Relations Manager ("FERM"). (Id.). When Wallace first began working for Sanderson Farms, Keisly Exum ("Exum") was the first shift personnel supervisor, and Eve Thompson was the split shift personnel supervisor with an emphasis on safety. (Id. at p. 11). The personnel supervisors are responsible for handling a variety of employee needs, including documenting vacation leave and birthday leave, notating absences and counseling employees on where they stood on the point system, completing Family Medical Leave Act ("FMLA") paperwork, and responding to requests for information from the Department of Labor. (Doc. 38-1, p. 58, 61; Doc. 38-2, ¶¶ 8-9; Doc. 42-2, 12). Sanderson Farm's policies and procedures and computer software were all new to Plaintiff, and she had to learn the company's systems. (Doc. 38-1, p. 41, 56). Yoaska Crumpton, who at the time was an employee records clerk, conducted Wallace's new hire orientation. (Doc. 38-2, ¶ 4).

### 2. FERM Position

Shortly after Wallace began working at Sanderson Farms, around May 2013, Wallace applied for the open FERM position. Exum was awarded the promotion over Wallace. (Doc. 42-2, p. 13). Exum has been employed by Sanderson Farms since 2006. (Doc. 38-2, ¶ 1). Prior to becoming the FERM, Exum held the position of personnel supervisor for three or four years. (Doc. 42-2, p. 11). Once the decision was made to promote Exum, upper level

management met with Wallace to explain that while she "did have a degree in human resources and things of that nature, that [Exum] has already been there for a period of time, but they were letting me know that they weren't necessarily just placing her there because of her seniority and just overruling my degree. They just felt that that would be a better fit." (Doc. 38-1, p. 133). Based on this conversation, Wallace was left with the impression that experience within the company alone was not enough to justify a promotion or compensation for a particular position because the employee still had to be trained in the new position regardless of her level of experience. (Id. at p. 132, 134).

### 3.    Disciplinary History and Performance Reviews

According to Exum, Wallace's "work performance fluctuated throughout her time" at Sanderson Farms. (Doc. 42-2, p. 20). Exum verbally coached Wallace when necessary and prepared written warnings when she noticed a pattern of noncompliance. (Doc. 38-2, ¶ 22). Exum testified that Wallace's "performance was not all bad. She would, you know, get better and perform her duties, and then at times, we would have to have discussions again, and at times, we would have to put it on paper." (Doc. 42-2, p. 21; Doc. 38-1, p. 69).

Wallace received her first written warning on July 18, 2013. (Doc. 38-1, p. 69-73, 300-301). The Memorandum of Understanding issued to Wallace states that on July 10, 2013, Exum verbally warned Wallace about properly documenting all birthday and vacation leave and entering absences in a timely

fashion. (Id. at p. 300). Exum further instructed Wallace that she was to email Exum if she had any absences that were more than three days old and where assistance was needed from the superintendents to complete the proper paperwork. (Id.). Several days later, Exum discovered additional personnel files containing absence and vacation entry errors. (Id.). Exum then warned Wallace that "[s]hould this problem continue disciplinary action up to and including termination may occur." (Id.).

Wallace does not specifically recall making any of the alleged errors. (Id. at p. 72). However, she signed the Memorandum of Understanding and accepted responsibility for her mistakes. (Id. at p. 70-71, 301). She testified that she did not "per se agree with it even though I signed it. I signed it out of compliance because I like to be compliant." (Id. at p. 71). She also did not feel that the writeup was fair because she was still training. (Id. at p. 94).

Despite this written warning, Wallace still received a satisfactory end of year performance review in December 2013. (Doc. 38-1, p. 323; Doc. 42-2, p. 24). Sanderson Farms conducts performance reviews once a year. (Doc. 42-2, p. 18). The review takes into consideration the employee's job performance, goals met, whether the employee had been written up, and whether the employee had any attendance issues. (Id.). The FERM completes the performance review with the division manager. (Id.).

Wallace was issued a second Memorandum of Understanding one year later on July 28, 2014. (Doc. 38-1, p. 77-83, 302). This writeup again addressed Wallace's "poor job performance for not properly completing absentees." (Id. at p. 302). As a result of Wallace failing properly to complete absentee paperwork for a particular employee, Sanderson Farms was unable to terminate the employee, who should first have been suspended and then terminated for violating the company's attendance policy. (Id.). She was once more warned that "[i]f these types of errors continue it will result in further disciplinary actions up to and including termination." (Id. at p. 302). Wallace accepted responsibility for her mistakes. (Id. at p. 82-82). Wallace again received a satisfactory performance review at the end of 2014. (Doc. 31-1, p. 324; Doc. 42-3, p. 3).

Wallace received her third Memorandum of Understanding on January 16, 2015. (Doc. 38-1, p. 92, Doc. 38-4, ¶ 59). The third writeup highlighted misunderstandings Wallace had about Sanderson Farms' FMLA policies and procedures. (Doc. 38-1, p. 92-95; Doc. 38-4, ¶¶ 60-62). Specifically, Wallace had not counted FMLA absences correctly and had neglected to send letters in a timely fashion to employees who were absent and not covered by any leave policy. (Doc. 38-1, p. 92-93; Doc. 38-4, ¶¶ 60, 62). Wallace defended her actions, saying that she "didn't know that it was that much of a pressing issue because they didn't abide by the rules for everyone." (Doc. 38-1, p. 93). She also testified that she did not think she had been adequately trained on FMLA prior to being

held accountable for any errors she might have made. (Id. at p. 95).  The third writeup additionally stated that Wallace had not responded to multiple requests for information from the Department of Labor regarding unemployment compensation claims, which resulted in benefits being approved. (Id. at p. 97). According to Wallace, if she did not respond to the Department of Labor, it was because she did not receive the requests. (Id. at 97-98).

In the following weeks, Exum continued to identify errors in Wallace's work. There were discrepancies in entering birthday leave and funeral leave. (Id. at p. 100-102). There was another issue with counting an absence for an employee who had a police report for one day of an absence and a doctor's note for the same absence and how that particular absence was counted. (Id. at p. 103-104). As a result of these continued performance issues, Sanderson Farms made the decision to terminate Wallace's employment. On February 6, 2015, Exum and Joe McGlamery, the division manager, met with Wallace to inform her of the decision. (Id. at p. 122). Wallace disputed the information contained in the final writeup and refused to sign it. (Id. at p. 98-99, 122).

### 4. Wage Claim

Sanderson Farms establishes salary based on a quartile system. (Doc. 38-2 ¶ 10). For each position, there are four quartiles for determining pay. (Id.). Typically, new employees "do not receive starting salaries above the midpoint of the wage range for their position until they have an opportunity to consistently

perform in the position." (Id. at ¶ 11). Wallace's starting salary was determined based on her falling within the second quartile for her particular position. (Id. at ¶ 12). Her starting annual salary was $42,000.00. (Doc. 38-1, p. 126).

Wallace received two raises during her tenure with Sanderson Farms. Her first merit raise of 4.5 percent was issued in December 2013 and went into effect in 2014. (Doc. 38-1, p. 126; Doc. 38-2, ¶ 12). Although Wallace was eligible for a merit raise of up to 6 percent, she only qualified to receive 4.5 percent because her employment did not commence until April 2013. (Doc. 38-1, p. 126, 129; Doc. 38-2, ¶ 12). Wallace received a second merit increase of 5.5 percent at the end of 2014. (Doc. 38-1, p. 139).

Wallace contends that Sanderson Farms discriminated against her in the terms of her pay based on her race. Wallace points to Yoaska Crumpton, a Hispanic female, as an individual who had inferior qualifications to Wallace but who earned a higher salary. Crumpton first began working for Sanderson Farms as a receptionist in 2008. (Doc. 38-2, ¶ 14). She worked her way through each position in the HR department. (Doc. 42-2, p. 13-14). At the time of Wallace's hire in April 2013, Crumpton was working as an employee records clerk and fell within the fourth quartile for that position. (Doc. 38-2, ¶ 14). When Crumpton was promoted to personnel supervisor in June 2013, even though she started the position two months after Wallace, Crumpton's salary was set in the third

quartile. (Id. at ¶ 17).[3] Exum and the division manager set Crumpton's salary. (Doc. 42-2, p. 15). The decision to place her within the third quartile "was based off of her experience within the department and her knowledge of our policies and procedures and how our paperwork is handled and taken care of." (Id.). Based on her continued performance within the department, Crumpton received the maximum raises within her quartile at the end of 2013 and 2014. (Doc. 38-2, ¶ 19). When Wallace was separated from her employment, Crumpton was earning $225.00 more per month than Wallace. (Doc. 38-1, p. 324-25).

### 5. Hostile Work Environment Claim

Wallace was known to many employee's at Sanderson Farms as the "church lady" or "church girl." (Doc. 38-1, p. 158). This moniker had its origins in part from the fact that on Wednesday evenings Sanderson Farms permitted Wallace to leave for a period of two hours to attend her weekly Bible study. (Id. at p. 157). She would work late on those days to make up the hours. (Id.). Wallace realized that many employees referred to her as the "church lady" because they could not remember her name, and she was not offended by the nickname. (Id. at p. 159).

---

[3] It is not evident from the record what Crumpton was earning as an employee records clerk. She had annual earnings of $47,064.00 in 2014 and $50,004.00 in 2015 in contrast to Wallace's $44,316.00 in 2014 and $47,304.00 in 2015. (Doc. 38-1, p. 323-325).

What did bother Wallace was snide commentary from Chad Goff. Goff often made sarcastic remarks about Wallace's faith and church attendance. (<u>Id.</u> at p. 153.) For example, he regularly said things like "don't nobody give an 'F' if you're a Christian"; "I ain't got to watch my mouth because you in the room"; "I guess I need to get me a f—ing church so I can take long breaks when I want to"; or "I hope you ain't got church tonight." (<u>Id.</u> at p. 154, 157, 173). Wallace testified that she "wasn't there to control how [Goff] speak or how he talks. It doesn't bother me if he cuss," but the "sarcasm . . . always had to do with me going to church or me being a Christian or religion of some sort." (<u>Id.</u> at p. 158).

Wallace complained to Exum about Goff's remarks. (<u>Id.</u> at p. 153). According to Wallace, Exum told her to "brush it under the rug" and "that's just Chad, just don't pay him no mind, just don't pay him no attention." (<u>Id.</u>). However, Wallace cannot recall when she made the report. (<u>Id.</u> at p. 154). And Exum has no memory of any issues between Wallace and Goff or of any other employee referencing Wallace as the "church lady." (Doc. 42-3, p. 14-15).

## C.    Title VII Claims

Plaintiff alleges that Defendant discriminated against her in both her termination and in her wages based on her race. Upon closer examination of the evidence, though, it is apparent that Plaintiff actually felt that Defendant's decision making stemmed from her superior educational qualifications and the fact that Plaintiff's direct supervisor, Keisly Exum, was intimidated by Plaintiff's

level of education. Title VII does not provide relief for an employee who believes she was treated differently from other employees based on her education.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a prima facie case of discrimination through either direct or circumstantial evidence. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004). Claims of race discrimination premised on circumstantial evidence, as is the present case, are evaluated under the burden-shifting framework developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). In order to make out a prima facie case under this framework, the plaintiff first must set forth "facts adequate to permit an inference of discrimination." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). If the plaintiff is able to do so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). The employer "need not persuade the court that it was actually motivated by the proffered reasons." Id. at 254-55. "If the employer satisfies its burden of articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production

shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." <u>Wilson</u>, 376 F.3d at 1087.

### 1. Termination

To establish a prima face case of discriminatory discharge, Plaintiff must produce evidence that (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she was terminated from that position; and (4) either she was treated less favorably than a similarly situated individual outside her protected class or she was replaced by a person outside of her protected class. <u>Maynard v. Bd. of Regents</u>, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing <u>McDonnell Douglas</u>, 411 U.S. at 802). "If the plaintiff can make this showing – which is 'not onerous' – the establishment of a prima face case creates a presumption that the employer discriminated against the plaintiff on the basis of race." <u>Flowers v. Troup Cty. School Dist.</u>, 803 F.3d 1327, 1336 (11th Cir. 2015) (quoting <u>Burdine</u>, 450 U.S. at 253-54).

It is undisputed that Plaintiff, a black woman, is a member of a protected class, that she was qualified for the position of personnel supervisor, and that she was terminated from her position. It is further undisputed that following Plaintiff's separation, Defendant replaced her with another black female. (Doc. 38-2, ¶¶ 26-27). Therefore, in order to establish her prima facie case, Plaintiff must demonstrate that she was treated less favorably than a similarly situated individual outside her protected class. "[T]o determine whether employees are

similarly situated, [the Court] evaluate[s] 'whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'" Burke-Fowler v. Orange Cnty., 447 F.3d 1079, 1087 (11th Cir. 2004) (quoting Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999)). The "quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Maniccia, 171 F.3d at 1368.[4] Even if a plaintiff and a comparator are similar in some respects, differences in their overall work history may render them not "similarly situated" for purposes of establishing a prime facie case. See, e.g., Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316-19 (11th Cir. 2003) (employee and comparator who committed the same act were not similarly situated because the comparator's overall record was better). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." Wilson, 376 F.3d at 1092 (quotation and emphasis omitted).

---

[4] Eleventh Circuit precedent provides two different standards for identifying a valid comparator. In some cases, the Court has said that the plaintiff's misconduct and the comparator's misconduct must be "nearly identical." Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1185 (11th Cir. 1984); Wilson, 376 F.3d at 1091. In other cases, the Eleventh Circuit has indicated that a comparator is similarly situated where the plaintiff and the comparator are accused of "the same or similar conduct." Holifield, 115 F.3d at 1562; Anderson v. WBMG-42, 253 F.3d 561, 564 (11th Cir. 2001). To the extent that some conflict exists between these two standards, the distinction in this particular case is irrelevant because Plaintiff has failed to present comparator evidence that meets either standard.

Plaintiff identifies her fellow personnel supervisors as valid comparators: Yoaska Crumpton, a Hispanic female, and Eve Thompson, a white female. According to Plaintiff, both Crumpton and Thompson committed similar errors entering data for birthdays, absences, vacations, and FMLA leave, yet neither of them was subject either to writeups or termination. According to Plaintiff, Keisly Exum once told her that Defendant created the safety position for Thompson "because [Thompson] didn't do so well in HR in the position that we were in." (Doc. 38-1, p. 63). Additionally, when Thompson filled in for Plaintiff while Plaintiff was out of town, Thompson made errors about which Exum later approached Plaintiff. (Id. at p. 67). Plaintiff pointed out to Exum that she was not responsible for those particular data entries, and Plaintiff was not otherwise reprimanded. (Id. at 68). Plaintiff testified that she was "almost willing to bet you she [Thompson] didn't get wrote up for it." (Id.). However, Plaintiff has no actual knowledge of what, if any, discipline Thompson received.

Plaintiff and Crumpton worked opposing shifts and shared a desk. (Id. at p. 146). Whenever Plaintiff would receive a writeup, she would look through Crumpton's drawer for files containing errors similar to those that led to Plaintiff being disciplined. (Id. at p. 166, 179-83, 193). Plaintiff recalls Crumpton being written up on only one occasion. (Id. at p. 166). According to Exum, Crumpton had a limited disciplinary history because after being verbally coached about a mistake, Crumpton would not make the same error again. (Doc. 38-2, ¶ 20).

Generally, though, Plaintiff believes that Crumpton was not being disciplined because Crumpton was friends with Exum. (Doc. 38-1, p. 166). However, Plaintiff admits that she does not "know [Crumpton's] performance issues" and that she can only speculate about any inconsistencies she may have discovered in Crumpton's files and whether there may have been a justification for not writing Crumpton up for her seemingly similar errors. (Id. at p. 166, 179, 83).

As the record reveals, none of the alleged comparators suggested by Plaintiff are similarly situated to her. The evidence demonstrates that on more than one occasion, Plaintiff was verbally instructed on performance related issues. When those issues did not resolve, she received a written Memorandum of Understanding outlining the deficiencies in her work and warning her that repeated violations would result in her termination. Over time, she received three writeups. Defendant terminated her after the fourth. In contrast, despite the one time Plaintiff alleges Thompson improperly entered leave information, Plaintiff can point to no other instances where Thompson committed infractions similar to Plaintiff. Plaintiff also has no personal knowledge regarding whether Thompson was disciplined in any way. As to Crumpton, Plaintiff, again, can point to no specific errors committed by Crumpton for which Crumpton was not reprimanded in some way. Even if Plaintiff and Crumpton were similar in some respects, they still are not similarly situated because Plaintiff had continued and repeated errors and, as a result, a far worse performance record. Plaintiff therefore has failed to

show a genuine issue of material fact as to whether similarly situated employees outside of her protected class engaged in similar conduct and were treated more favorably than Defendant treated her.

Even if the Court were to assume that Plaintiff established a prima facie case of discrimination, Defendant has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff that Plaintiff has not rebutted. Namely, Defendant has demonstrated that Plaintiff after being verbally reprimanded continued to document leave and absences incorrectly, leading to a series of written warnings and eventually termination. Having articulated these reasons, the burden shifts to Plaintiff to show that the reasons given by Defendant were pretextual. She may carry that burden by "cast[ing] doubt on [Defendant's] proffered nondiscriminatory reasons sufficient to allow a reasonable factfinder to determine that [they] were not what actually motivated [Defendant's] conduct." Silvera v. Orange Cty. Sch. Bd., 244 F.3d 1253, 1258 (11th Cir. 2001) (internal quotation marks omitted). "If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." Crawford v. City of Fairburn, 482 F.3d 1305, 1308 (11th Cir. 2007). An employee cannot "recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed

by simply quarreling with the wisdom of that reason." <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1030 (11th Cir. 2000).

Plaintiff does not dispute that she made errors when she was working as a personnel supervisor for Defendant. She additionally has not put forth sufficient evidence from which a jury could conclude that she was treated differently from similarly situated individuals outside of her protected class. In short, she has done nothing more than question the business judgment of Defendant in terminating her, which is not sufficient to establish pretext.

The <u>McDonell Douglas</u> framework, however, "is not the *sine qua non* for a plaintiff to survive summary judgment in a discrimination case." <u>Sims v. MVM, Inc.</u>, 704 F.3d 1327, 1333 (11th Cir. 2013). Rather, "the plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." <u>Smith v. Lockheed-Martin Corp.</u>, 644 F.3d 1321, 1328 (11th Cir. 2011). "A triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" <u>Id.</u> (quoting <u>Silverman v. Bd. of Educ.</u>, 637 F.3d 729, 734 (7th Cir. 2011)).

Here, Plaintiff has not produced "sufficient evidence to allow a jury to infer" that Defendant fired her because she is black. <u>Smith</u>, 644 F.3d at 1328. In fact, Plaintiff has clearly stated not that she believes she was terminated not based on

23

her race but "because of my education and the fact that I was still continuing and striving." (Doc. 38-1, p. 167). Without more evidence from which a jury could discern that Defendant's decision to terminate Plaintiff was motivated by some discriminatory purpose, summary judgment in favor of Defendant is appropriate on Plaintiff's discriminatory discharge claim.

### 2. Disparate Pay

Plaintiff next alleges that Defendant discriminated against her in her pay. Disparate pay claims under Title VII are governed by the familiar burden-shifting framework of McDonnel Douglas. See Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1528 (11th Cir. 1992). To state a prima facie case of intentional compensation discrimination based on race, a plaintiff must establish that (1) she belongs to a racial minority; (2) she received low wages; (3) similarly situated comparators outside her protected class received higher compensation; and (4) she was qualified to receive the higher wage. Cooper v. Southern Co., 390 F.3d 695, 743 (11th Cir. 2004), *overruled on other grounds by* Ash v. Tyson Foods, Inc., 546 U.S. 454, 457 (2006). An employee identified by the plaintiff as a comparator "must be similarly situated in all relevant respects." Wilson, 376 F.3d at 1091. A comparator is not similarly situated for the purposes of a disparate pay claim if the comparator has a different number of years of experience or seniority from the plaintiff. See Cooper, 390 F.3d at 743; see also Lee v. Mid-State Land & Timber Co., 285 F. App'x 601, 607 (11th Cir. 2008) (finding that a plaintiff and an

alleged comparator were not similarly situated because the comparator had education, training, and experience that the plaintiff lacked).

Plaintiff identified Yoaska Crumpton as a comparator in support of her wage claim. As already established, Crumpton is Hispanic and, therefore, falls outside of Plaintiff's protected class. The parties additionally do not dispute that Crumpton was compensated at a slightly higher rate than Plaintiff. However, even though the two women held the same title of personnel supervisor, they were not otherwise similarly situated. Crumpton began working in Defendant's HR department in July 2008, a little less than five years before Plaintiff started in April 2013. During her time within the department, Crumpton worked her way through the various HR positions. She therefore was intimately familiar with Defendant's policies and procedures prior to being promoted to personnel supervisor. Plaintiff, in contrast, while well educated in the field of Human Resources, had never previously worked for Defendant or any other processing plant and had no prior experience working in a substantively similar HR position. Plaintiff and Crumpton therefore are not similarly situated in all relevant respects, and Crumpton is not a valid comparator for the purpose of establishing a prima facie case of wage discrimination.

Even if Crumpton was a proper comparator, Plaintiff has not established that Defendant's non-discriminatory reason for paying Crumpton more than Plaintiff is a mere pretext for racial discrimination. Defendant has explained that it

sets employee salaries based on a quartile system and that there are four quartiles assigned to any position within the company. (Doc. 38-2, ¶ 10). New employees typically do not receive a starting salary above the midpoint of the wage range for the position. (Id. at ¶ 11). Salary is otherwise based on a number of factors, including performance, merit, skill, and experience. (Id. at ¶ 10). Upon hiring Plaintiff in April 2013, Defendant set her salary within the second quartile for her position, which is consistent with Defendant's stated policy. (Id. at ¶ 12). In contrast, when Defendant promoted Crumpton from employee records clerk to personnel supervisor in July 2012, only two months after hiring Plaintiff, Defendant set Crumpton's salary within the third quartile for the position. (Id. at ¶ 17). Defendant made the decision to start Crumpton within the third quartile based on Crumpton's five years of previous experience with the company, her knowledge of the company's policies and procedures, and her strong prior work performance. (Id.; Doc. 42-2, p. 15).

Because Defendant demonstrated a legitimate, non-discriminatory reason for the pay disparity between Plaintiff and Crumpton, the burden now shifts to Plaintiff "to establish by a preponderance of the evidence that the proffered justifications are a pretext" for racial discrimination. Miranda, 975 F.2d at 1529. In other words, Plaintiff must demonstrate that a discriminatory reason more likely than not motivated the employer to pay her less or that the employer's explanation is not worthy of credence. Id.

Plaintiff here has failed to carry her burden of proving pretext. Plaintiff has not come forward with any evidence to place Defendant's veracity in question beyond her own belief that she should have been compensated at a higher rate because she had advanced degrees and because she held the personnel supervisor position for two months longer than Crumpton. (Doc. 38-1, p. 144, 149). Plaintiff's generalized belief that she earned a lower wage because of her race and "white privilege" is not enough to establish discriminatory animus. (Id. at p. 146, 151-52); see Rollins v. TechSouth, Inc., 833 F.2d 1525, 1529 (11th Cir. 1987) ("unsubstantiated assertions alone are not enough to withstand a motion for summary judgment"). Plaintiff's conclusory argument is not a substitute for evidence, and she has not otherwise provided evidence to substantiate her allegations. Plaintiff thus has failed to demonstrate that any genuine issue of material fact exists from which a reasonable fact finder could conclude that Defendant's reason for paying her less than Crumpton was pretextual or that Defendant intended to discriminate against her on the basis of her race. Therefore, Defendant is entitled to summary judgment on Plaintiff's wage claim.

### D.  Hostile Work Environment

Plaintiff contends that Defendant discriminated against her on the basis of her religion by permitting the existence of a hostile work environment. Title VII's prohibition against discrimination in respect to an employee's "terms, conditions, or privileges of employment" extends to include harassment resulting in a

discriminatorily hostile or abusive work environment. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). To prove a hostile work environment claim, an employee must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Id. However, Title VII is not intended to serve as "a general civility code." See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). An employee claiming a hostile work environment based on religious discrimination must show that (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and created a discriminatorily abusive work environment; and (5) the employer is either directly or vicariously responsible for the environment. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).

An employee claiming that harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment must satisfy both a subject and an objective component. Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc). First, the employee must establish that she "subjectively perceive[d] the environment to be abusive." Harris, 510 U.S. at 21.

Then, she must objectively show that her work environment was one "that a reasonable person would find hostile or abusive." Id.

In making the objective determination, the following factors should be considered: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Mendoza, 195 F.3d at 1246. But "the objective element is not subject to mathematical precision." Bryant v. Jones, 575 F.3d 1281, 1297 (11th Cir. 2009). Rather, the court must view the evidence "cumulatively and in the totality of the circumstances." Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 808 (11th Cir. 2010). However, as the Supreme Court has emphasized, "teasing, offhand comments, and isolated incidents" do not constitute discriminatory changes in the terms and conditions of employment. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (citation omitted).

Plaintiff contends that throughout the course of her employment at Defendant's processing plant she was subjected to harassment because of her religious beliefs. Specifically, she notes that other employees regularly referred to her as the "church lady" or "church girl." (Doc. 38-1, p. 158). Another employee, Chad Goff, also frequently made offensive jabs and sarcastic remarks about Plaintiff's faith and church-going activities, such as "don't nobody give an 'F' if you're a Christian"; "I ain't got to watch my mouth because you in the room"; "I

guess I need to get me a f—ing church so I can take long breaks when I want to";
or "I hope you ain't got church tonight." (Id. at p. 154, 157, 173).

As to Plaintiff's subjective perception of her work environment, Plaintiff undermined her own claims when she testified that she was not particularly bothered when other employees called her "church lady," largely because she recognized that "it's probably because they don't remember my name." (Id. at p. 159). She also acknowledged that other remarks like, "I hope you ain't got church tonight," were not necessarily meant to be derogatory. (Id. at p. 173). Further, Plaintiff has not demonstrated that Goff's other offhand or obnoxious comments were severe or pervasive enough to alter the terms or conditions of her employment. And, even if Plaintiff did subjectively perceive Goff's remarks as severe, it would not be objectively reasonable to construe them as anything more than "teasing, offhand comments." Faragher, 524 U.S. at 788; Miller, 277 F.3d at 1275. Accordingly, because the evidence does not establish a genuine issue of material fact concerning the existence of a hostile work environment, summary judgment in favor of Defendant is appropriate.

## III.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion to Strike (Doc. 48) the affidavits of Shanice Roseborough (Doc. 42-4); Ronald Alford (Doc. 42-5); and Greg Ward (Doc. 42-6). The Court further **GRANTS** Defendant's Motion for Summary Judgment. (Doc. 38).

**SO ORDERED** this 19th day of November, 2018.

s/ Hugh Lawson
**HUGH LAWSON, SENIOR JUDGE**

aks